**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| COMPLETE TRANSPORT SYSTEMS LLC, | Case No. _____ |
| *Plaintiff*, | |
| v. | **VERIFIED COMPLAINT** |
| COMPLETE TRANSPORT SOLUTIONS NY LLC; JOHN DEBETTA; JIMMY SANDOVAL; CHARLENE LEMARD; FREDDY IDROVO; AMELIA BOODOO; KIMBERLY TRINCHESE; COMPLETE TRANSPORT SOLUTIONS INC.; IMPORTER CARGOEXPRESS LLC; and DOES 1-10, | Jury Trial Requested |
| *Defendants*. | |

Plaintiff Complete Transport Systems LLC ("CTS"), by and through undersigned counsel, as and for its Complaint against defendants Complete Transport Solutions NY LLC ("CTS NY"), John DeBetta, Jimmy Sandoval, Charlene Lemard, Freddy Idrovo, Amelia Boodoo (collectively, "Former CTS Defendants" and, with "CTS NY," the "CTS NY Defendants"), Kimberly Trinchese, Complete Transport Solutions Inc. ("CTS Inc."), and Importer CargoExpress LLC ("IC Express"), hereby alleges as follows:

## NATURE OF THE ACTION

1.      Complete Transport Systems LLC ("CTS") has for years operated a U.S. Customs and Border Protection ("CBP") bonded Container Freight Station ("CFS"), warehouse, and CBP bonded carrier company to service customers whose air freight is imported and exported through John F. Kennedy International Airport ("JFK") and in the New York-New Jersey market.  As of April 1, 2025, Complete Transport Solutions NY LLC ("CTS NY") is doing the exact same thing.  Confused?  So are many of CTS's customers—which is precisely what CTS NY was banking on.

1

2.      John DeBetta is the link between CTS and CTS NY; he founded both companies. Back in 2021, he sold CTS for millions of dollars but stayed on as President at a sizable salary until his supposed retirement last September.  Yet a few short months later, Mr. DeBetta opened CTS NY, re-creating—or, perhaps more aptly, pilfering—what he had at CTS, right down to the same workforce, nearly half of whom resigned *en masse* from CTS to follow him.

3.      Between the valuable proprietary information belonging to CTS that the Former CTS Defendants took with them and the strikingly similar "CTS" and "Complete Transport" marks that CTS NY is exploiting (including CTS NY's new email domain, ctsdelivers.com), the CTS NY Defendants have managed to cunningly lure away many CTS customers who do not even realize, thanks to CTS NY's deft sleight of hand, that they are now dealing with an entirely different entity.

4.      As if that were not grievous enough, CTS has also uncovered evidence that Mr. DeBetta, routinely throughout his tenure at CTS, audaciously funneled close to $1 million from CTS's coffers to CTS Inc., another company that he owns, and to IC Express, a company that Mr. Sandoval owns, without any discernible countervailing benefit to CTS.

5.      CTS brings this action against CTS NY, John DeBetta, and the disloyal employees who paved the way for CTS NY's opening to hold them accountable for the irreparable harm their wrongdoing has wrought upon CTS.

## **PARTIES**

6.      Plaintiff Complete Transport Systems LLC is a limited liability company formed under the laws of New York that has its principal place of business at 22 Lawrence Lane, Lawrence, New York 11559.

7.    Defendant Complete Transport Solutions NY LLC is a limited liability company formed under the laws of New York that has its principal place of business at 147-09 182nd Street, Jamaica, New York 11413.

8.    Defendant John DeBetta is the Executive Co-Founder of CTS NY and the former President and Managing Member of CTS who, upon information and belief, resides in St. James, New York.

9.    Defendant Jimmy Sandoval is an employee of CTS NY who worked for CTS as a Terminal Manager until he resigned on April 8, 2025, and who, upon information and belief, resides in Lynbrook, New York.

10.    Defendant Charlene Lemard is an employee of CTS NY who worked for CTS as Accounting Team Lead until she resigned on April 4, 2025, and who, upon information and belief, resides in Far Rockaway, New York.

11.    Defendant Freddy Idrovo is an employee of CTS NY who worked for CTS as an office agent for Freight Force until he resigned on April 1, 2025, and who, upon information and belief, resides in East Elmhurst, New York.

12.    Defendant Amelia Boodoo is an employee of CTS NY who worked for CTS through her company, Multiserve Logistics, Inc., until she resigned on or about April 1, 2025, and who, upon information and belief, resides in Orlando, Florida.

13.    Defendant Kimberly Trinchese, Mr. DeBetta's sister, formerly worked for CTS as the Accounting Supervisor and, upon information and belief, resides in Howard Beach, New York.

14.    Defendant Complete Transport Solutions Inc. is a corporation formed under the laws of New York that, upon information and belief, has its principal place of business at 17 Arrowood Drive, St. James, New York 11780.

15.     Defendant Importer CargoExpress LLC is a limited liability company formed under the laws of New York that, upon information and belief, has its principal place of business at 11 Lafayette Avenue, Lynbrook, New York 11563.

16.     CTS is presently unaware of the true names of the defendants identified under the fictitious names Does 1-10 but will amend the Complaint to identify them as they are discovered.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a) because CTS seeks redress for claims that arise under the laws of the United States, including substantial claims under the federal Lanham Act.

18.     This Court has supplemental jurisdiction over CTS's state law claims pursuant to 28 U.S.C. § 1367 because they are so related to the federal law claims asserted in this action that they form part of the same case or controversy under Article III of the United States Constitution.

19.     This Court also has original jurisdiction over the common law claims for trademark infringement, common law unfair competition, and violation of New York GBL § 360-l because they are joined with substantial and related claims asserted under the federal Lanham Act, 15 U.S.C. § 1051 et seq.

20.     Venue is proper in this judicial district, pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to this action occurred within this District.

## FACTUAL BACKGROUND

### DeBetta's Sale of CTS to EFL

21.     CTS provides bonded CFS, warehouse, TSA screening, and trucking solutions. With its container freight station (CFS) in close proximity to JFK that is bonded by CBP, CTS can pick up imported goods that arrive via air, temporarily store those goods until they are cleared by

CBP, and then transport the goods to their final destinations in the greater New York and New Jersey areas including JFK, LaGuardia, and Newark Liberty airports.  In addition, CTS's container freight station is certified by the Transportation Security Administration ("TSA") to screen export cargo, the transport of which CTS then arranges via truck to the export airlines.

22.     Since at least May 11, 2006, CTS has continuously sold and promoted services in United States commerce under the CTS and COMPLETE TRANSPORT marks.

23.     CTS has expended significant time and resources developing the CTS line of trademarks, which include its common law marks CTS and COMPLETE TRANSPORT (collectively, "CTS Marks").

24.     The CTS Marks are distinctive and, over the past nineteen (19) years of continuous use, have become associated with CTS in the minds of consumers.

25.     The CTS Marks are prominently displayed in its employees' email signatures, elsewhere in the regular course of business, and through word of mouth, contributing to brand recognition and industry reputation.

26.     Consumers, like freight forwarders, logistics companies, and other supply chain providers, regularly associate the CTS Marks with CTS for the provision of bonded warehouse, screening, and trucking services at JFK, LaGuardia, and Newark Liberty Airports.

27.     Customers of CTS range from sophisticated, multi-billion dollar companies to much smaller entities that are relatively new to the supply chain arena.

28.     Government agencies, including the TSA, also associate the CTS Marks with CTS.

29.     The CTS Marks have attained a high degree of recognition in the logistics industry and, as a result, have helped generate gross revenue for CTS of more than $20 million.

30.     In September 2021, EFL Global LLC ("EFL"), an international logistics company, and its affiliate agreed to acquire CTS to expand EFL's air freight, warehouse, screening, and trucking capabilities out of New York.

31.     At the time of the acquisition, Mr. DeBetta was the ultimate owner of CTS, as he held all of the shares in defendant CTS Inc., the entity that owned one hundred percent of the membership interests in CTS.

32.     Pursuant to the Membership Interest Purchase Agreement ("Purchase Agreement") by which EFL acquired CTS, EFL paid Mr. DeBetta the handsome sum of $6.1 million in exchange for all of the membership interests in CTS.

33.     EFL, accordingly, acquired the entire CTS business, including its trucks, roster of customers, intellectual property, and the lease for its warehouse.  Thus, as of September 1, 2021, when the acquisition closed, Mr. DeBetta no longer retained any ownership in CTS's assets or intellectual property.

34.     Section 3.16(b) of the Purchase Agreement states that "Schedule 3.16(b) identifies each material item of Intellectual Property that any third Party owns and that the Company [CTS] uses pursuant to a written license or agreement (other than generally commercially available software, including off-the-shelf software subject to a shrink-wrap or clickwrap license), if any…."

35.     Schedule 3.16 of the Purchase Agreement, in turn, states "None"—making clear that neither Mr. DeBetta nor CTS Inc. possessed or was asserting ownership of the CTS Marks.

36.     Following EFL's acquisition of CTS in September 2021, CTS continued to operate using the CTS Marks.

37.    EFL also retained Mr. DeBetta in his role as President of CTS, with primary responsibility for the company's day-to-day operations, sales, and client relationships until he resigned in September 2024.

38.    Upon his departure, Mr. DeBetta advised that he was "retiring."

39.    To the contrary, recently-discovered documents and information reveal that he was preparing to launch a new, nearly identical company that would steal CTS's business, infringe and dilute the CTS Marks, confuse customers, and misappropriate CTS's confidential information.

### *The Surreptitious Launch of CTS NY*

40.    On or about February 21, 2025, CTS NY was born when Articles of Organization of Complete Transport Solutions NY LLC, signed by its President, Eric Faulkner, were filed with New York's Department of State.

41.    According to its website, ctsdelivers.com, CTS NY's leadership team is comprised of Mr. Faulkner (President), Brian Ciambra (Chief Executive Officer), and Mr. DeBetta (Executive Co-Founder).

42.    CTS and CTS NY are direct competitors in the marketplace.  Just like CTS, CTS NY bills itself as "a full service container freight station (CFS) strategically located at New York's JFK Airport" that provides "warehousing" and "transport" services.

43.    Also just like CTS, the CTS NY website is replete with references to "CTS" and "Complete Transport"—*i.e.*, the CTS Marks—which are no doubt designed to create, and are creating, both actual confusion and a likelihood of confusion among CTS's customers.  CTS NY's April 2, 2025 press release, for example, touts:

CTS's leadership team includes executive co-founders Eric Faulkner and John Debetta, who bring decades of noteworthy experience in the aviation and logistics sectors. Their industry expertise and commitment to delivering exceptional customer service are key drivers of CTS's go-to-market success.

With a focus on robust infrastructure, competitive rates, and operational excellence, CTS is dedicated to helping businesses of all sizes move forward with confidence and efficiency.

44.      CTS NY's website address and email domain, ctsdelivers.com, which also use the CTS Mark, are designed to cause confusion, and are actually causing and likely to cause further confusion among CTS's customers, including by falsely designating CTS NY's services as originating from or connected with CTS.

45.      Nor do the similarities end there.  Nearly half of CTS's workforce left *en masse* in the early part of April 2025 and are now working at CTS NY.

46.      In addition, the signage on CTS NY's new building also contains the CTS Mark and the Complete Transport Mark:



47.      Preparations to launch CTS NY began many months ago.  Indeed, Mr. DeBetta was scheming to reopen essentially the same company he had sold three years earlier and, upon information and belief, solicited customers for that venture even before he resigned from CTS.

48.     Those efforts accelerated after CTS NY was formed.  For instance, in early March 2025, Mr. DeBetta and Mr. Sandoval, along with Mr. Ciambra, met with a potential customer and falsely misled the customer into believing that CTS would now be known as CTS NY with a new location and new email address when in actuality, CTS NY was a new company and not affiliated with CTS.

49.     At that point in time, nearly a month before he formally departed CTS, Mr. Sandoval already had a CTS NY email address, which he used to lay the groundwork for the official opening of CTS NY, all while continuing to collect a paycheck from CTS.

50.     For example, on or about March 9, 2025, a CTS customer sent an email to, among others, Mr. DeBetta at his personal email address, Mr. Sandoval at his CTS email address, and Mr. Ciambra at his CTS NY email, evidencing actual consumer confusion.

51.     On March 24, 2025, Mr. Sandoval communicated throughout the workday with a different CTS customer about a pickup of air freight using his CTS NY email address.  That email chain improperly refers to CTS's CBP (Customs and Border Protection) FIRMS code, which is used to facilitate customs clearance and is company-specific.

52.     In addition, during the days and weeks before they exited CTS in favor of CTS NY, Mr. Sandoval and Ms. Lemard used their CTS email accounts to recruit numerous customers to CTS NY.

53.     The Former CTS Defendants also took with them confidential information belonging to CTS that they are now using at CTS NY.

54.     For example, Mr. Sandoval was seen removing a box of documents from CTS's premises, while Ms. Lemard has sought to leverage her "familiar[ity] with the requirements" that numerous CTS customers expect in order to handle their shipments at CTS NY.

55.     Ms. Boodoo and Mr. Idrovo have likewise pirated from CTS the business relationship with long-time customer Freight Force and all associated proprietary information and know-how.

### *Purposeful Creation of Confusion in the Market*

56.     Any doubt as to Mr. DeBetta's unscrupulous intentions was erased when he told one CTS customer soon after CTS NY opened for business in early April 2025 that "nothing has changed; we just moved to a new building."

57.     Other former CTS employees now at CTS NY made similar duplicitous statements to customers before they left CTS, with the obvious and deliberate objective of luring those customers from CTS to CTS NY.

58.     On March 28, 2025, for example, Mr. Sandoval sent an email from his CTS email account to a CTS customer advising that "[o]ur new warehouse opens April 1st." That warehouse, as Mr. Sandoval well knew, did not belong to CTS, but was the CTS NY warehouse.

59.     In another brazen display of betrayal, on April 1, 2025, Mr. Idrovo, writing from his CTS email account, told a customer that "our new location [is] 147-09 182nd street, Jamaica, NY 11413." When the customer replied, "No idea you are moving, is this the address we use from now on for all cargo?," Ms. Boodoo responded from her CTS email account, "That will be our new address going forward." Glaringly absent from this back-and-forth is any disclosure that the new address is not, in fact, associated with CTS. To the contrary, the repeated use of "our" gives the unmistakable (but deliberately false) impression that it is.

60.     In the midst of the above email chain, Ms. Boodoo added the following note to the signature block of her CTS email account, directing every unwitting CTS customer with whom she communicated via email thereafter to a CTS NY email address going forward:

**\*\*Please note out new group email address freightforcejfk@ctsdelivers.com \*\***

Little did customers of CTS know that by using that email address they would be communicating with a company that was not CTS.

61.    Ms. Boodoo also responded from her CTS email account to a CTS customer inquiry on April 1, 2025, directed to Mr. Idrovo, writing that she was "[a]dding Freddy new email address" at CTS NY so that he could assist.  At no point did Ms. Boodoo inform the customer that Mr. Idrovo had moved to an entirely separate company.  Nor would the customer have reason to know, given that Mr. Idrovo's new email address contained the CTS Mark.

62.    Similarly, on April 1, 2025, various CTS customers requested quotations for services from CTS, and Ms. Boodoo responded each time with the requested quotation but improperly directed the CTS customer to use the @ctsdelivers.com address going forward, thereby siphoning the business to CTS NY under false pretenses.

63.    Also on that same date, Ms. Boodoo sent out a billing email to a CTS customer, added Mr. Idrovo's CTS NY email address to the chain, and again directed the customer to a "new" CTS email address at @ctsdelivers.com—so that CTS NY, upon and information and belief, could improperly profit from work performed by CTS, without incurring the associated costs.

64.    That Ms. Boodoo's intention, like the rest of the CTS NY Defendants, was to dupe customers is perhaps clearest when comparing side-by-side the signature block (on the left) that Ms. Boodoo began using in communications from her CTS email account on April 1, 2025, with the signature block (on the right) that she used before then:

Thank you,                                          Thank you,
Amelia Boodoo                                       Amelia Boodoo

**Complete Transport Solutions**          **Complete Transport Systems**
*JFK agent for Freight Force*               *JFK agent for Freight Force*
147-09 182nd St                             22 Lawrence Lane
Jamaica, NY 11413                           Lawrence, New York 11559
Lawrence, New York 11559                    Office (718) 995-2026
Office (718) 475-2033                       Cell (718) 536-9179
Cell (718) 536-9179                         Facility Code F-580

65.    Not only did Ms. Boodoo copy the COMPLETE TRANSPORT mark, she also used the same colors and font—and even forgot to delete the "Lawrence, New York 11559" line.

66.    Finally, even after she departed CTS, Ms. Boodoo continued steering customers trying to contact CTS to CTS NY via an auto-reply message on her CTS email account that pointed recipients to "new email addresses," "[o]ur new warehouse address" and "[n]ew office #" at CTS NY and requested that those recipients "update [their] system."



67.    The deception also went beyond the allusions to new email addresses and a change of address. On March 31, 2025, a CTS customer emailed the Team Complete group email address at CTS seeking a rate quote. Mr. Idrovo responded the next morning from his CTS email account but cc'ed his CTS NY email account on the reply. When the customer replied to all, Mr. Idrovo addressed the customer's follow-up request from his CTS NY email account, without any mention that the job being quoted would be performed by CTS NY, not CTS.

68.    A similar ruse played out with another CTS customer who emailed Mr. Idrovo on March 31, 2025, at his CTS email address to check the status of inbound air freight that CTS was

to pick up from JFK and deliver by truck to its final destination.  When the freight was not delivered on April 1, the customer replied to Mr. Idrovo that afternoon with the CTS group email address in copy.  Ms. Boodoo responded by adding Mr. Idrovo's CTS NY email address, which Mr. Idrovo proceeded to use in three subsequent communications with the customer about the job. Unbeknownst to the customer, the freight that the customer agreed with CTS to handle was handled instead by CTS NY.

69.    Additional emails reveal that customers of CTS had no idea that CTS and CTS NY are distinct entities—as was CTS NY's intention.  On April 3, 2025, for example, a customer sent an email to Mr. Idrovo and Mr. Sandoval at their CTS addresses, as well as to an Operations address at CTS NY, attaching a bill of lading to be used with CTS's provision of services.  Had the customer intended to engage CTS NY for this pickup because it knew that is where Mr. Idrovo and Mr. Sandoval had moved, it makes no sense for the customer to include their CTS email addresses.  As it turned out, an office agent at CTS NY replied to the email and thereby stole the business from CTS.

70.    Four days after that, another customer sent an email to Mr. Sandoval at his CTS address and to the Operations address at CTS NY requesting a rate quote.  Mr. Sandoval responded to the email using his CTS NY email account, despite still being on the CTS payroll.  Again, it is readily apparent that the customer drew no distinction between CTS and CTS NY.

71.    As recently as March 27, 2025, seven months after he departed CTS, Mr. DeBetta appears to have been engaging in unauthorized communications with customers on behalf of CTS on uShip—an online marketplace for shipping services—or, at minimum, confusing customers as to the entity with which he is now associated.  A very negative customer review posted to CTS's Google page in late March 2025 attaches an exchange the customer had with "debetta7," whom

the customer described as "rude" and "trying to harass the customer" sufficiently so that "[h]e will be reported to FMCSA and Better Business Bureau."

72.     Perhaps the point is best made by a customer of CTS who emailed CTS on April 7, 2025, and asked, "I'm getting a little confused, Jimmy [Sandoval] now works for Complete Solutions, is this the same company as Complete Transport LLC?" That customer's confusion is representative of many CTS customers and is precisely what Mr. DeBetta and others at CTS NY intended to create.

73.     CTS NY is preying upon this confusion not just by stealing customers away from CTS but also, upon information and belief, by actively invoicing customers for work that CTS did.

74.     The intentional and willful infringement of the CTS Marks by the CTS NY Defendants are causing irreparable harm to the reputation and goodwill that CTS has worked so hard, and paid so much, to build and protect. Absent injunctive relief, CTS will continue to suffer irreparable injury due to the confusion, mistake, and deception that have been generated and will continue to be generated among the marketplace and the public.

75.     This confusion prevents CTS from controlling the reputation of its CTS Marks and results in further harm to CTS if either quality deficiencies in CTS NY's services or negative publicity around CTS NY are mistakenly attributed to CTS and cause prospective customers to forgo doing business with CTS.

76.     Since the launch of CTS NY, CTS has lost Freight Force and Kuehne-Nagel as customers.

77.     Cease and desist letters sent to the CTS NY Defendants by counsel for CTS went largely unanswered. Although several of the Former CTS Defendants advised that they were retaining counsel so that they could respond accordingly, no such responses ever came.

14

***Defendants' Embezzlement, Theft, and Fraud While In CTS's Employ***

78.     To make matters worse, recently-discovered forensic evidence reveals extensive misconduct beyond the CTS NY Defendants' clandestine scheme to form and operate CTS NY.

79.     CTS has discovered that Ms. Lemard regularly stole $100 from CTS's petty cash on a near-weekly basis throughout her multi-year tenure at CTS.

80.     Far more damaging, however, is the revelation that Mr. DeBetta and Ms. Trinchese, who was responsible for CTS's finances until she resigned in September 2024 along with Mr. DeBetta, appear to have funneled, during a two-plus year scheme, illicit payments in the aggregate amount of nearly $275,000 from CTS to defendant CTS Inc.

81.     Over the period spanning January 2022 through August 2024, CTS made eighty-five (85) payments to CTS Inc., mostly in the $2,000 to $3,000 range, for which there are no corresponding invoices or contracts.  Indeed, it is not at all clear that CTS Inc., which is owned by Mr. DeBetta, operates any business whatsoever.

82.     But that is not all.  Evidence also suggests that over roughly that same time period, CTS made at least 344 payments to defendant IC Express, a trucking company owned by Mr. Sandoval, approaching $700,000.  Once again, no discernible agreements exist between CTS and IC Express, nor does CTS have invoices to support these payments.  Like the payments to CTS Inc., the payments to IC Express appear to have been brazen fraud.

83.     As perhaps one last way to tap CTS on his way out, Mr. Sandoval charged $3,770 on his corporate American Express card in March 2025.  The vast majority of these unauthorized charges were for meals at four restaurants, all within an 11-mile radius of CTS NY's office—leaving open the possibility that Mr. Sandoval was entertaining guests in connection with the new business.

84.     Additionally, on or about April 7, 2025, Mr. DeBetta contacted CTS's insurance agent to request termination of two CBP bonds, in CTS's name, that allow CTS to operate as a CBP bonded CFS and CBP bonded carrier.  Having "retired" from CTS some seven months earlier, Mr. DeBetta had absolutely no authority to make such a request—but did so, upon information and belief, at least partly in an attempt to retrieve cash collateral that CTS put up for the bond prior to his sale of CTS to EFL.  Mr. DeBetta's fraudulent actions caused CTS's CBP bonds to be terminated on or about April 23, 2025, without notice to CTS.  On May 20, 2025, CTS learned of Mr. DeBetta's fraudulent conduct.  If Mr. DeBetta's scheme to defraud CTS had not been corrected, CTS would have lost its valuable ability to act as a CBP bonded CFS and CBP bonded carrier.

85.     Mr. DeBetta also concealed at least two default judgments that were entered against CTS post-sale (during Mr. DeBetta's tenure as President) relating to misconduct by CTS in the pre-sale period.

### COUNT ONE
### (Violation of the Federal Lanham Act – Unfair Competition / False Designation of Origin / False Advertising)
### (CTS NY)

86.     CTS re-alleges and incorporates by reference the factual allegations in each of the preceding paragraphs as if fully set forth herein.

87.     CTS has sold logistics services in United States commerce under the CTS Marks since at least May 11, 2006. CTS has used the CTS Marks continuously since that time.

88.     CTS has devoted substantial time, effort, and financial resources to promoting the CTS Marks in connection with the marketing and sale of its services in interstate commerce. CTS's Marks have become, through widespread and favorable public acceptance and recognition, an asset of substantial value as a symbol of CTS, its quality services, and its goodwill.  The CTS

Marks are distinctive and the consuming public recognizes the CTS Marks and associates them with CTS.

89.     Notwithstanding CTS's established rights in the CTS Marks, CTS NY and its employees, agents, and officers adopted and are using the identical marks in interstate commerce in connection with the sale and offering for sale of its services.

90.     Without CTS's consent, CTS NY has used and continues to use the CTS Marks in connection with the sale, offering for sale, distribution, or advertising of its services.

91.     CTS NY has engaged in this improper activity despite having actual knowledge of CTS's use and ownership of the CTS Marks.

92.     CTS NY knowingly, willfully, fraudulently, and intentionally misrepresented that CTS is now CTS NY in order to convince customers to purchase what they think are CTS's services from CTS NY.

93.     CTS's customers have been confused and are likely to be confused regarding CTS NY's false statements and misrepresentations.

94.     CTS NY has falsely represented that CTS has a new warehouse when, in fact, CTS has not moved and does not have a new warehouse.

95.     CTS NY has falsely represented that CTS has new email addresses when, in fact, CTS has not changed email addresses.

96.     CTS NY has used the CTS Marks in a manner that is likely to cause confusion among consumers that CTS is the source of the CTS NY services and/or that CTS is affiliated with and/or approves of CTS NY's services.

97.    CTS NY's actions have misled and continue to be likely to mislead the public into concluding that CTS NY's services originate with, or are authorized by, CTS, which will damage both CTS and the public.

98.    CTS has no control over the quality of services provided by CTS NY, and because of the source confusion caused by CTS NY, CTS has lost control over its valuable goodwill.

99.    CTS NY has advertised and offered its services for sale using the CTS Marks with the intention of misleading, deceiving, or confusing consumers as to the origin of its services and of trading on CTS's reputation and goodwill.  CTS NY's use of the CTS Marks constitutes use of a false designation of origin that wrongfully and falsely designates CTS NY's services as originating from or connected with CTS in violation of 15 U.S.C. §1125(a).  The actions of CTS NY as alleged herein constitute intentional, willful, knowing, and deliberate unfair competition.

100.    CTS NY's unauthorized use of the CTS Marks in interstate commerce as described above constitutes false designation of origin, false advertising, and unfair competition under 15 U.S.C. §1125(a) and has caused and is likely to continue to cause consumer confusion, mistake, or deception.

101.    CTS NY's conduct constitutes false and misleading representations of facts which are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of CTS NY with CTS, or as to the origin, sponsorship, or approval of CTS NY's services or commercial activities by CTS.

102.    CTS NY's conduct constitutes false and misleading representations of facts in commercial advertising or promotion and misrepresents the nature, characteristics, or qualities of CTS NY's services, or commercial activities.

103. As a direct and proximate result of CTS NY's violation of the Lanham Act, CTS has suffered and will continue to suffer irreparable loss of income, profits, and goodwill, and CTS NY has unfairly acquired and will continue to unfairly acquire income, profits, and goodwill.

104. CTS NY's violation of the Lanham Act will cause further irreparable injury to CTS if CTS NY is not restrained by this Court from further violation of CTS's rights. CTS has no adequate remedy at law.

105. As a direct and proximate result of CTS NY's wrongful conduct, CTS has been damaged and is entitled to a recovery in an amount to be determined at trial.

**COUNT TWO**
**(Unfair Competition – Common Law)**
**(CTS NY Defendants)**

106. CTS re-alleges and incorporates by reference the factual allegations in each of the preceding paragraphs as if fully set forth herein.

107. The CTS NY Defendants' use of the CTS Marks in connection with their offer of services identical to CTS is and will continue causing confusion among customers as to the source of the services and CTS's sponsorship or affiliation with CTS NY.

108. This includes, but is not limited to, CTS NY's use of "Complete Transport" in its company name, "Complete Transport Solutions NY LLC"; its use of "CTS" in its company web address, "ctsdelivers.com"; and its repeated use of "Complete Transport" and "CTS" on its website and in its marketing.

109. The CTS NY Defendants adopted the "Complete Transport" and "CTS" mark with the intention of capitalizing on CTS's reputation and goodwill and of creating actual confusion between CTS and CTS NY among customers. The CTS NY Defendants are leveraging the confusion created by CTS NY's use of the name "Complete Transport" and "CTS" to siphon customers and other business opportunities away from CTS for CTS NY.

110.    At the direction, and for the benefit, of CTS NY, the Former CTS Defendants also used their CTS emails while still employed by CTS to mislead CTS customers into believing that CTS NY was part of CTS in order to divert customers to CTS NY.

111.    The CTS NY Defendants' conduct is contrary to honest practice in industrial or commercial matters.

112.    As a direct and proximate result of the CTS NY Defendants' unfair competition under common law, CTS has suffered harm and damage in an amount not yet determined.

113.    CTS will continue to suffer harm until the CTS NY Defendants' unfair competition is enjoined by this Court.

114.    Upon information and belief, such unfair competition has been and continues to be willful.

## COUNT THREE
### (Violation of New York General Business Law § 360-1)
### (CTS NY)

115.    CTS re-alleges and incorporates by reference the factual allegations in each of the preceding paragraphs as if fully set forth herein.

116.    As set forth in more detail above, the CTS Marks are distinctive and are protected under federal law and New York law.

117.    CTS NY's use of the CTS Marks is likely to cause confusion as to the proper origin of CTS NY's services.

118.    CTS NY's use of the CTS Marks is likely to cause dilution of the CTS Marks.

119.    CTS NY's conduct violates §360-l of New York's General Business Law.

120.    As a direct and proximate result of CTS NY's wrongful conduct, CTS has been damaged and is entitled to a preliminary and permanent injunction enjoining and restraining CTS NY, its officers, agents, servants, employees, and attorneys, and all other persons in active concert

or participation with them, from using the CTS Marks or any mark substantially similar to the CTS Marks or any mark that, alone or in combination, would create a likelihood of confusion, mistake, or deception with the CTS Marks.

## COUNT FOUR
### (Common Law Trademark Infringement)
### (CTS NY)

121.    CTS re-alleges and incorporates by reference the factual allegations in each of the preceding paragraphs as if fully set forth herein.

122.    As set forth in more detail above, the CTS Marks are valid and legally protectable marks under federal law and New York law.

123.    CTS NY's use of the CTS Marks has caused and is likely to cause confusion as to the proper origin of CTS NY's services.

124.    CTS NY's use of the CTS Marks is not, and has never been, authorized by CTS.

125.    CTS NY is liable for common law trademark infringement under New York law.

126.    CTS NY acted willfully and in bad faith.

127.    As a direct and proximate result of CTS NY's wrongful conduct, CTS has been damaged and is entitled to preliminary and permanent injunctive relief enjoining and restraining CTS NY, its officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with them, from using the CTS Marks or any mark substantially similar to the CTS Marks or any mark that, alone or in combination, would create a likelihood of confusion, mistake, or deception with the CTS Marks.

## COUNT FIVE
### (Breach of Fiduciary Duty under New York Law)
### (Former CTS Defendants)

128.    CTS re-alleges and incorporates by reference the factual allegations in each of the preceding paragraphs as if fully set forth herein.

129.    The Former CTS Defendants owed fiduciary duties to CTS arising out of the special relationship that existed between CTS and the Former CTS Defendants, as trusted employees, officers, or agents of CTS.

130.    At all relevant times prior to his purported retirement in September 2024, Mr. DeBetta was the President of CTS.

131.    During this time period, as a result of his relationship with CTS and independent of any express or implied contract, Mr. DeBetta was an employee, officer, or agent of CTS and, as such, owed fiduciary duties to CTS, including the utmost duty of loyalty and the duty to act in good faith and deal fairly with CTS.

132.    At all relevant times between his hiring in May 2020 (before the sale of CTS to EFL) and his resignation on April 8, 2025, Mr. Sandoval was an employee who had a position of trust at CTS.

133.    During this time period, as a result of Mr. Sandoval's relationship with CTS and independent of any express or implied contract, Mr. Sandoval was an employee or agent of CTS and, as such, owed fiduciary duties to CTS, including the utmost duty of loyalty and the duty to act in good faith and deal fairly with CTS.

134.    At all relevant times between her hiring in November 2019 (before the sale of CTS to EFL) and her resignation on April 4, 2025, Ms. Lemard was an employee of CTS.

135.    During this time period, as a result of Ms. Lemard's relationship with CTS and independent of any express or implied contract, Ms. Lemard was an employee or agent of CTS and, as such, owed fiduciary duties to CTS, including the utmost duty of loyalty and the duty to act in good faith and deal fairly with CTS.

136.    At all relevant times between his hiring in October 2022 and his resignation on April 1, 2025, Mr. Idrovo acted as an employee of CTS.

137.    During this time period, as a result of Mr. Idrovo's relationship with CTS and independent of any express or implied contract, Mr. Idrovo was an employee or agent of CTS and, as such, owed fiduciary duties to CTS, including the utmost duty of loyalty and the duty to act in good faith and deal fairly with CTS.

138.    At all relevant times until she left, Ms. Boodoo acted as an employee assigned to CTS.

139.    During this time period, as a result of Ms. Boodoo's relationship with CTS and independent of any express or implied contract, Ms. Boodoo was an employee assigned to CTS or agent of CTS and, as such, owed fiduciary duties to CTS, including the utmost duty of loyalty and the duty to act in good faith and deal fairly with CTS.

140.    The Former CTS Defendants each breached their respective fiduciary duties to CTS by, among other things, prioritizing, working on, and endeavoring to act directly against the interests of CTS by competing directly with CTS, usurping business opportunities belonging to CTS, using their CTS e-mail addresses and access to CTS's computer systems and physical documents in order to mislead, confuse, and divert CTS customers to CTS NY and to transmit CTS's confidential information outside of CTS, and otherwise attaining success, benefits, and profits for CTS NY, themselves, or others, instead of for CTS.

141.    The Former CTS Defendants each further breached their respective fiduciary duties to CTS by organizing a competing business for the purpose of diverting business from CTS and by encouraging the resignation of CTS's employees in favor of CTS NY.

142.     In breaching their respective fiduciary duties to CTS, the Former CTS Defendants engaged in misconduct that permeated the most material and substantial part of their service to CTS, namely their duties to use CTS's property only on CTS's behalf, including the Former CTS Defendants' CTS email accounts and CTS's computer systems, as well as CTS's confidential information, and not to use such valuable information to enrich a competitor such as CTS NY.

143.     CTS has been significantly harmed by the Former CTS Defendants' breaches of their fiduciary duties in an amount to be determined at trial.

## COUNT SIX
**(Aiding and Abetting Breach of Fiduciary Duty under New York Law)**
**(CTS NY and DeBetta)**

144.     CTS re-alleges and incorporates by reference the factual allegations in each of the preceding paragraphs as if fully set forth herein.

145.     As described above, the Former CTS Defendants breached their fiduciary duties of loyalty, good faith, and fair dealing to CTS by, among other things, prioritizing, working on, and endeavoring to act directly against the interests of CTS by unfairly competing directly with CTS; usurping business opportunities belonging to CTS; using their CTS e-mail accounts and access to CTS's computer systems and physical documents in order to mislead and divert CTS customers to CTS NY and to transmit CTS's confidential information outside of CTS; attaining success and monetary profits for CTS NY, themselves, or others, instead of for CTS; organizing a competing business for the purpose of diverting business from CTS; and encouraging the resignation of CTS's key employees in favor of CTS NY.

146.     After his departure from CTS in September 2024, Mr. DeBetta knowingly participated in, and provided substantial assistance to, the other Former CTS Defendants who were still employed by CTS in breaching their fiduciary duties as outlined above, including by operating the infringing business he designed to siphon CTS's customers with their assistance and, upon

information and belief, encouraging those Former CTS Defendants to perform work for CTS NY and to divert CTS's customers to CTS NY while still employed by CTS, including by misusing and misappropriating CTS's property, including email accounts, computer systems, and confidential information.

147.    CTS NY, the business Mr. DeBetta designed to carry out his scheme, knowingly participated in, and provided substantial assistance to, the Former CTS Defendants in breaching their fiduciary duties as outlined above by siphoning CTS's customers with their assistance and, upon information and belief, encouraging the Former CTS Defendants to perform work for CTS NY and to divert CTS's customers to CTS NY while still employed by CTS, including by misusing and misappropriating CTS's property, including email accounts, computer systems, and confidential information.

148.    CTS has been significantly harmed by the Former CTS Defendants' breaches of their fiduciary duties, which were encouraged, assisted, aided, and abetted by CTS NY and Mr. DeBetta, in an amount to be determined at trial.

**COUNT SEVEN**
**(Civil Conspiracy)**
**(CTS NY Defendants)**

149.    CTS re-alleges and incorporates by reference the factual allegations in each of the preceding paragraphs as if fully set forth herein.

150.    The CTS NY Defendants entered into a civil conspiracy to engage in, *inter alia*, trademark infringement, false designation of origin, unfair competition, trademark dilution, breach of fiduciary duties, tortious interference with business relationships, and conversion.

151.    The CTS NY Defendants did this by agreeing to organize, and in fact organizing, a competing business with substantially similar trademarks, intending to confuse CTS's customers and divert them to the competitor, CTS NY.  The Former CTS Defendants did this while still

employed by CTS and used their positions of trust and confidence to divert customers using CTS's property, including email accounts, computer systems, and confidential information, and to steal CTS's confidential information.  Among other things, the Former CTS Defendants explicitly misrepresented the identity of CTS NY to CTS's customers, leading them to believe they were the same business.  CTS NY coordinated with the Former CTS Defendants during their employment and after, working in tandem to divert CTS's customers to CTS NY, including by overt misrepresentations and leveraging the Former CTS Defendants' positions within CTS.

152.    Upon information and belief, in furtherance of the conspiracy and with the knowledge, consent, and support of the other CTS NY Defendants, Mr. DeBetta, together with Ms. Trinchese, also facilitated the illegal transfer of $275,000 to CTS Inc.; Mr. Sandoval, while still employed at CTS, facilitated 344 unjustified payments to IC Express, a trucking company he owns, in the aggregate amount of approximately $700,000; and Mr. Sandoval took a box of documents containing CTS's confidential information from CTS's office.

153.    The CTS NY Defendants conspired with each other for the common purpose of unlawfully usurping CTS's business and customers.

154.    Each of the CTS NY Defendants performed an overt act in furtherance of the conspiracy as outlined above.

155.    Their misconduct was intentional, outrageous, deceitful, and undertaken in bad faith.

156.    As a result of the combined, concerted, and continued efforts of the CTS NY Defendants, CTS was, is, and continues to be damaged and thus is entitled to recover damages including but not limited to financial loss, loss of goodwill and reputation, compensatory and

special damages, interest and punitive damages in an amount as the proof at a trial may warrant that were directly caused by the misconduct of the CTS NY Defendants.

**COUNT EIGHT**
**(Tortious Interference with Business Relationships)**
**(CTS NY Defendants)**

157.    CTS re-alleges and incorporates by reference the factual allegations in each of the preceding paragraphs as if fully set forth herein.

158.    CTS has existing or prospective business relations with numerous customers, including Freight Force and Kuehne-Nagel, its own employees, and former employees, including the Former CTS Defendants.

159.    CTS NY and DeBetta wrongfully, recklessly, maliciously, offensively, and without justification or privilege, knowingly and intentionally interfered with CTS's existing or prospective business relations through wrongful and unjustifiable means, including by adopting and using trademarks designed to confuse CTS's customers; using, themselves or through people acting at their direction or on their behalf, CTS's property, including email accounts and computer systems, to communicate with CTS's customers to induce them into moving their business to CTS NY, including by making affirmative misrepresentations to CTS's customers that CTS NY was part of or the same as CTS; raiding CTS's employees and inducing them to breach their fiduciary duties to CTS; and exercising control over CTS employees to disrupt CTS's business and pilfer documents containing confidential information from CTS's offices to use in competition with CTS.

160.    Similarly, the other Former CTS Defendants wrongfully, recklessly, maliciously, offensively, and without justification or privilege, knowingly and intentionally interfered with CTS's existing or prospective business relations through wrongful and unjustifiable means, including by using CTS's property, including email accounts and computer systems, to

27

communicate with CTS's customers to induce them into moving their business to CTS NY, including by making affirmative misrepresentations to CTS's customers that CTS NY was part of or the same as CTS; inducing CTS's employees to breach their fiduciary duties to CTS; using their control over CTS's employees to disrupt CTS's business; and using CTS's confidential information to compete with CTS.

161.    At the time of its actions, the CTS NY Defendants had actual knowledge of the relevant existing or prospective business relationships and acted intentionally, willfully, maliciously, recklessly, and offensively.

162.    Defendants cannot justify their actions as legitimate competition.

163.    As a direct and foreseeable result of Defendants' actions, customers of CTS, including Freight Force and Kuehne-Nagel, have been duped into transitioning their business to CTS NY, causing irreparable harm to CTS.

164.    CTS is entitled to injunctive relief against CTS NY along with full monetary damages.

**COUNT NINE**
**(Fraudulent Concealment)**
**(Former CTS Defendants)**

165.    CTS re-alleges and incorporates by reference the factual allegations in each of the preceding paragraphs as if fully set forth herein.

166.    The Former CTS Defendants were all employees or agents of CTS and, as alleged above, owed fiduciary duties to CTS, including to fully and accurately disclose all material facts regarding their service.

167.    In breach of those fiduciary duties, the Former CTS Defendants actively and intentionally concealed from CTS that they were dealing with CTS's customers on behalf of, and for the benefit of, a competitor, CTS NY; that they were exploiting their positions at CTS and the

trust CTS reposed in them to compete with CTS; and that they were using CTS's confidential information for the benefit of CTS NY.

168. CTS could not have discovered these facts through ordinary diligence due to the active measures that the Former CTS Defendants took to conceal them.

169. These facts were material to CTS, and the Former CTS Defendants' failure to disclose them caused CTS to refrain from acting because, had these facts been disclosed, CTS would have immediately terminated the Former CTS Defendants' positions and anyone else coordinating with or assisting them. Instead, the Former CTS Defendants were able to maintain their positions and continue to exploit CTS to their satisfaction and until their respective voluntary departures.

170. The Former CTS Defendants made the above misrepresentations and omissions for the purpose of deceiving and defrauding CTS and with the intention of having CTS rely on such misrepresentations and/or omissions.

171. The Former CTS Defendants' actions, misrepresentations, and omissions, and CTS's justifiable reliance thereon, caused CTS injury.

172. As a direct and proximate result of the Former CTS Defendants' fraudulent concealment of material facts from CTS, CTS has been damaged in an amount to be determined at trial.

## COUNT TEN
### (Conversion)
**(CTS NY, Sandoval, IC Express, DeBetta, Trinchese, CTS Inc., and Lemard)**

173. CTS re-alleges and incorporates by reference the factual allegations in each of the preceding paragraphs as if fully set forth herein.

174. Mr. Sandoval, while still employed at CTS, facilitated 344 unjustified payments to IC Express, a trucking company he owns, in the aggregate amount of approximately $700,000.

175.     CTS has a possessory right and interest in the approximately $700,000.

176.     Mr. Sandoval and IC Express exercised unauthorized dominion over the approximately $700,000 to the exclusion of CTS.

177.     In addition, Mr. Sandoval, with the knowledge, consent, and for the benefit of, CTS NY, took a box of documents from CTS's office that contained confidential information.

178.     CTS has a possessory right and interest in that box of documents.

179.     Mr. Sandoval and CTS NY exercised unauthorized dominion over the box of documents to the exclusion of CTS.

180.     Finally, Mr. Sandoval with the knowledge, consent, and for the benefit of, CTS NY, charged $3,770 on his corporate American Express card in March 2025.  The vast majority of these un-authorized charges were for meals at four restaurants, all within an 11-mile radius of CTS NY's office—leaving open the possibility that Mr. Sandoval was entertaining guests in connection with the CTS NY's business.

181.     CTS has a possessory right and interest in that $3,770.

182.     Mr. Sandoval and CTS NY exercised unauthorized dominion over the $3,770 to the exclusion of CTS.

183.     Mr. DeBetta and Ms. Trinchese during a more-than-two-year scheme facilitated illicit and unjustified payments from CTS to CTS Inc., in the aggregate amount of approximately $275,000.

184.     CTS has a possessory right and interest in the approximately $275,000.

185.     Mr. DeBetta, Ms. Trinchese, and CTS Inc. exercised unauthorized dominion over the approximately $275,000 to the exclusion of CTS.

186. Ms. Lemard during the course of her employment with CTS routinely stole petty cash from CTS in increments of about $100 totaling an amount yet to be determined.

187. CTS has a possessory right and interest in the petty cash.

188. Ms. Lemard exercised unauthorized dominion over the petty cash to the exclusion of CTS.

**COUNT ELEVEN**
**(Unjust Enrichment)**
**(CTS NY and DeBetta)**

189. CTS re-alleges and incorporates by reference the factual allegations in each of the preceding paragraphs as if fully set forth herein.

190. To the extent CTS NY and Mr. DeBetta cannot be held liable for aiding and abetting the Former CTS Defendants' breach of their fiduciary duties to CTS, CTS NY and Mr. DeBetta have realized, and continue to realize, economic benefits from the other Former CTS Defendants' breaches of their fiduciary duties to CTS.

191. The economic benefits CTS NY and Mr. DeBetta realized, and will continue to realize, from the other Former CTS Defendants' breaches of their fiduciary duties to CTS include the customer relationships and deals the Former CTS Defendants unlawfully diverted from CTS, the former CTS employees raided from CTS, and the confidential information taken from CTS.

192. Additionally, Mr. DeBetta was paid $6.1 million by EFL for the purchase of CTS.

193. Mr. DeBetta thereafter created a nearly identical competing business, CTS NY, and has diverted CTS's staff and customers.

194. To the extent Mr. DeBetta or CTS NY are permitted to continue unfairly competing with CTS as alleged in this complaint, Mr. DeBetta will be unjustly enriched if he is also permitted to retain the $6.1 million paid to him for the purchase of CTS.

195.    Equity and good conscience militate against permitting CTS NY and Mr. DeBetta to retain these benefits, as they were procured through deceit, breaches of fiduciary duty, unlawful competition, and misconduct.

## PRAYER FOR RELIEF

**WHEREFORE,** CTS respectfully seeks judgment in its favor and against Defendants as follows:

(a)    Preliminary and permanent injunctive relief enjoining Defendants and their officers, agents, servants, employees, and attorneys, and all other persons in active concert or participation with them from using the "CTS" and "Complete Transport" marks or any mark substantially similar thereto or any mark that, alone or in combination, would create a likelihood of confusion, mistake or deception with "CTS" or "Complete Transport";

(b)    Preliminary and permanent injunctive relief enjoining Defendants from using or disclosing CTS's confidential and/or proprietary information;

(c)    Preliminary and permanent injunctive relief enjoining Defendants from committing any acts calculated to cause CTS's customers to believe that services provided by CTS NY are in any way affiliated with CTS;

(d)    Preliminary and permanent injunctive relief enjoining Defendants from interfering with CTS's contracts and/or business relationships, including those with customers, insurance agents, and other service providers;

(e)    Directing Defendants to respond to expedited discovery;

(f)    Awarding CTS actual, incidental, and compensatory damages in an amount to be determined at trial;

(g)    Awarding CTS punitive damages, based on Defendants' willful and malicious activities, in an amount to be determined at trial;

(h)    Awarding CTS its reasonable attorney's fees and costs of suit;

(i)    Awarding CTS pre-judgment and post-judgment interest on such sums awarded; and

(j)    Awarding CTS such other and further relief that is deemed just and proper.

## JURY DEMAND

Plaintiff CTS requests a trial by jury.

Dated:  May 27, 2025

**GIBBONS P.C.**

By:   s/ Kevin R. Reich                              .
Frederick W. Alworth (*pro hac vice* to be filed)
Kevin R. Reich
John D. Haggerty (*pro hac vice* to be filed)
One Gateway Center
Newark, New Jersey  07102-5310
T:  973-596-4500
falworth@gibbonslaw.com
kreich@gibbonslaw.com
jhaggerty@gibbonslaw.com

Jennifer L. Friedman (*pro hac vice* to be filed)
**LAW OFFICES OF JENNIFER L. FRIEDMAN, PLLC**
5406 Broadway, #518
Lancaster, New York 14086
Tel: (716) 601-9045
jenfriedman@jfriedmanlaw.com

*Attorneys for Plaintiff*
*Complete Transport Systems LLC*

**VERIFICATION**

**MARK SOLA** declares, pursuant to 28 U.S.C. § 1746:

I am the Vice President, Brokerage & Compliance, at EFL Global LLC, the parent company of plaintiff Complete Transport Systems LLC in this action. I have read the foregoing Verified Complaint and the allegations contained therein. Those allegations are true to the best of my personal knowledge, except as to those allegations which are made upon information and belief. As to the allegations made upon information and belief, I believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May _27th_, 2025.

_____.
Mark Sola